**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

LYNDSAY GREENAN

        :

    Plaintiff

        :

  v                                   Civil Case No. L-10-1868

        :

BOARD OF EDUCATION OF WORCESTER
COUNTY, et al.         :

    Defendants         :

o0o
**<u>MEMORANDUM</u>**


This case arises out of the decision of Defendant, Board of Education of Worcester County ("the Board"), not to renew Plaintiff Lyndsay Greenan's teaching Contract following her initial two-year probationary employment period at Ocean City Elementary School ("OCES"). In addition to the Board, she names as Defendants Dr. Jon Andes, Superintendent of Schools of Worcester County, Irene Kordick, the principal of OCES, and Karen Marx, the assistant principal (the "Individual Defendants"). Greenan advances claims for Pregnancy Discrimination (Count I), Pregnancy Harassment (Count II), Race Discrimination (Count III), and Retaliation (Count IV) against the Board pursuant to 42 U.S.C. § 2000(e), violation of equal rights pursuant to 42 U.S.C. § 1983 (Count V) against all Individual Defendants, and negligent supervision under Maryland common law (Count VI) against Dr. Andes.

On September 23, 2010, the Board and the Individual Defendants filed separate Motions to Dismiss. Docket Nos. 15 and 16. The Court has carefully reviewed the papers and no hearing is deemed necessary. <u>See</u> Local Rule 105.6 (D. Md. 2010). For the reasons stated herein, the

Court will, by separate Order, GRANT IN PART and DENY IN PART the Board's Motion and

GRANT IN PART and DENY IN PART the Individual Defendants' Motion.


I.     BACKGROUND

The following are the relevant facts as alleged in the Complaint.  In 2007, Lyndsay

Greenan was offered a teaching position at OCES in Worcester County, Maryland.  Because

Greenan and her boyfriend had difficulty securing an affordable place to live in Ocean City, the

principal of OCES, Irene Kordick, suggested that the couple rent a house from her.

Kordick delegated her secretary, Lisa Brown, to show Greenan the property.  Greenan

alleges that, while showing her the house, Brown advised her that Kordick "did not feel it would

be a good idea for her to get pregnant during her first year of teaching."  Pl.'s Compl. 5, Docket

No. 1.

Greenan received positive feedback and evaluations during her first semester at OCES.

On November 30, 2007, she received her first written evaluation, which contained no

unsatisfactory marks and made optimistic predictions about her career as a teacher.

Early in December of 2007, Greenan learned that she was pregnant.  She informed

Kordick as well as the assistant principal, Karen Marx.  Both offered Greenan their

congratulations.

A few days later, Greenan received a written evaluation from Rosemary Heller.  Ms.

Heller had observed Greenan in the classroom just prior to her announcement that she was

pregnant.  Ms. Heller's review characterized Greenan's performance as "satisfactory," but also

included some negative comments and suggested that, on the day of observation, Greenan was

somewhat unprofessionally attired.

Two days after Ms. Heller presented her evaluation, Greenan was observed again, this time by Marx. Again, the review was "satisfactory" but not unconditionally positive. Greenan claims that, contrary to the normal policy at OCES, she was given only formal, written feedback but no informal, off-the-record input. Marx directed Greenan to begin meeting with another teacher, Kristin Van Kirk, who would serve as a mentor.

A week after announcing her pregnancy, Greenan experienced a severe bout of morning sickness. She arranged for another teacher to cover her class while she went to lie down and, when her condition did not improve, she went home for the day. Before leaving, Greenan jotted down brief notes for the substitute. Upon Greenan's return, Kordick issued her a written reprimand for her failure to prepare an adequate substitute teacher plan. According to Greenan, Kordick refused to accept her explanation that the notes were done hurriedly and were never intended to be a formal lesson plan.

During OCES's winter break, Greenan, who is Caucasian, and her boyfriend, who is African-American, became engaged. She alleges that when she returned in January and announced her engagement, neither Kordick nor Marx offered her any congratulations. A "congratulations" poster was placed in the teachers' lounge for another teacher who had also become engaged, but not for Greenan.

Greenan contends that from this point forward, Kordick and Marx were "hyper-vigilant" in scrutinizing her performance and reprimanded her unfairly. Id. at 7. They chastised her for making personal calls, though she explained that she was speaking to parents of her students. They wrote her up for tardiness, claiming that she must have sneaked into the school by a side door. Greenan's evaluations, which she asserts occurred much more frequently than evaluations of other teachers, were uniformly "unsatisfactory."

3

Following her return, Greenan alleges that she was continually subjected to harassment and humiliation.[1] She further claims that she was ordered to remove her family picture and her daughter's artwork from her desk because they "took away from her students," though other teachers were permitted to display such items. Id. at 8.

Greenan gave birth at the end of the summer.[2] When she returned to OCES she was observed in the classroom by Marx, who gave her an unsatisfactory review. Marx allegedly explained that she was expecting the observation to be perfect and, because it was not, it was unsatisfactory. Greenan states that Kordick also continued to treat her with animosity, telling her that just because she looked nice, she should not assume that she was doing a good job. Kordick also allegedly conveyed that Dr. Andes, the school superintendant, "was aware of, and approved of, [Kordick's] treatment of Greenan," and had told her to "encourage Greenan to look for employment in other counties." Id. at 9.

About this time, Greenan decided to stop renting from Kordick. Greenan states that when Kordick performed an inspection of the property, "Kordick facetiously wondered aloud whether marks on the ceiling might have been caused by her fiancé bouncing a basketball. There was no basketball present and there was no reason for Kordick to assume that her fiancé played basketball . . . ." Id. Greenan interpreted this comment as perpetuating a degrading racial stereotype.

---

[1] Greenan states that when the time came for her students to undergo standardized testing, Kordick and Marx predicted her failure and encouraged her to rely on Van Kirk to prepare the students. When the students succeeded, their success was attributed to Van Kirk. On one occasion, Kordick allegedly called Greenan into her office regarding an issue with the water bill at the house Greenan was renting from her. With Marx present, Kordick called the water company and conducted a discussion on the speakerphone. Another incident involved a competition to determine which class could achieve the highest turnout at a PTA meeting. Greenan states that her class mustered 100% attendance, but that Kordick refused to count one of the parents because he was a janitor at the school, causing Greenan's class to lose the competition. She alleges that other teachers were allowed to count parents who were also employees towards their total.

[2] The exact date of birth is never specified.

On April 27, 2009, Greenan received a letter from Dr. Andes informing her that he had decided to accept Kordick's recommendation that her teaching contract not be renewed. Greenan appealed this decision to the Board. Greenan alleges that, shortly before a hearing on the matter, Kordick summoned the rest of the OCES faculty to a meeting from which she was excluded. Kordick reportedly announced that an unnamed person had made up "horrible" accusations against her, and that as a result she was going to have to defend herself in front of the Board. Staff members were urged to write letters of support for Kordick, and instructed not to comment if asked about the accusations.

Following the hearing, the Board issued a decision finding that Greenan was "not a good fit" at OCES and upholding the non-renewal of her contract. Id. at 10.

Greenan timely filed a complaint with the Equal Opportunity Employment Commission ("EEOC"), which issued her a right-to-sue letter on June 30, 2010. Greenan filed suit on July 12, 2010, and on September 13, 2010 Defendants filed the pending Motions to Dismiss.


## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead plausible, not merely conceivable, facts in support of his claim. See Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007). The complaint must state "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1965. The Court must, however, "assume the veracity [of well-pleaded factual allegations] and then determine whether they plausibly give rise to an entitlement of relief." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009).

### III. ANALYSIS

#### i. Claims against the Board

##### i. Timeliness

In 1978, Congress amended Title VII of the Civil Rights Act by enacting the Pregnancy

Discrimination Act ("PDA"), which provides in relevant part:

> The terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work.

42 U.S.C. § 2000e(k). Pregnancy discrimination and harassment claims are variations of gender

discrimination claims, and are analyzed under Title VII. See DeJarnette v. Corning. Inc., 133 F.

3d 293, 297 (4th Cir. 1998).

A threshold issue in this case is whether Greenan's pregnancy discrimination and

pregnancy harassment claims were timely filed. Title VII provides that when, as here, the person

aggrieved has initially instituted proceedings with a State or local agency with authority to grant

or seek relief from the practice complained of, a charge must be filed with the EEOC within 300

days of the allegedly unlawful employment practice. 42 U.S.C. § 2000e-5(e)(1). The

Defendants urge that, since pregnancy is a temporary condition, "logic and common sense

require that [the charge] be filed within 300 days following the last day of that pregnancy in

order to be timely . . . ." Board's Mt. to Dismiss 12, Docket No. 15. Greenan gave birth "at the

end of summer" 2008. Pl.'s Compl. 9, Docket No. 1.

It is undisputed, however, that Greenan's EEOC complaint was filed within 300 days of

the Board's decision not to renew her teaching contract. Dr. Andes informed Greenan of the

decision by letter dated April 27, 2009, and she filed her EEOC complaint on September 30,

2009. The Defendants' argument, then, is really an argument that Greenan's claims do not arise out of her pregnancy. "In a pregnancy discrimination case, the plaintiff . . . bears the ultimate burden of establishing that the defendant discriminated against her 'because of' her pregnancy." DeJarnette, 133 F. 3d at 297. The Defendants reason as follows: in a pregnancy discrimination case, any adverse action taken *because* of the pregnancy must occur *during* the pregnancy. If the actions Greenan complains of were taken during that time, the Complaint is untimely. If the actions took place after that time, they are not actionable because Greenan was no longer a member of the protected class.

Obviously, "[w]hile some effects of pregnancy linger beyond the act of giving birth, at some point the female employee is no longer 'affected by pregnancy, childbirth, or related medical conditions,' for purposes of the PDA." Solomen v. Redwood Advisory Co., 183 F. Supp. 2d 748, 753 (E. D. Pa. 2002). To make out a prima facie case then, a plaintiff must show more than that she was at one time pregnant and later suffered an adverse employment action. See Brinkman v. State Dept. of Corrections, 863 F. Supp. 1479, 1486 (D. Kan. 1994).

The effects of pregnancy do not end sharply when the pregnancy itself does. In Solomen v. Redwood Advisory Co., the court held that "a plaintiff who was not pregnant at or near the time she was terminated must demonstrate that the effects of her pregnancy continued to exist at the time she was terminated, either in actual fact or in the thoughts and actions of those responsible for firing her." 183 F. Supp. 2d at 754. "Such a showing might consist of evidence that harassment or discriminatory statements by plaintiff's supervisors began during her pregnancy or maternity leave and continued with some regularity until the adverse employment action occurred." Id.

This inquiry, therefore, merges with consideration of the substantive elements of Greenan's claims. If she can state a prima facie case, timeliness will not be a bar.

### ii. Count 1 – Pregnancy Discrimination

Greenan has alleged a string of events of precisely the character called for by Solomen. She claims that her relationship with Kordick and the rest of OCES began well, but that a pattern of discrimination and harassment began immediately following her announcement that she was pregnant and continued until her termination. The Court finds these allegations sufficient to infer that hostility stemming from Greenan's pregnancy persisted until, and was a contributing factor in, Kordick's decision to recommend that Greenan's contract not be renewed. Greenan's pregnancy discrimination claim may proceed.

### iii. Count II – Pregnancy Harassment

Count II of Greenan's Complaint alleges pregnancy harassment. As stated, claims brought under the PDA are analyzed as a subset of gender discrimination claims under Title VII. To succeed on a Title VII claim of workplace harassment, a plaintiff must establish that the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer. Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003). In a claim for pregnancy harassment, the offending conduct must obviously be based not simply on sex but on the condition of pregnancy.

Two of these elements may be dealt with quickly. The first is applicable mainly to sexual harassment cases, in which the defendant may contend that the plaintiff was not offended by the comments or advances. Any harassment in the case at bar was unwelcome. As to the fourth

element, the Board does not raise any arguments as to its liability for the actions of Kordick and Marx, if proved.

The second element requires that harassment be based on the plaintiff's pregnancy and not some other factor. Greenan offers two pieces of evidence to suggest that pregnancy is the reason for the alleged harassment she suffered. The first is the statement of Lisa Brown, Kordick's secretary, that Kordick "did not feel it would be a good idea for her to get pregnant during her first year of teaching." The second is the coincidence of timing. Greenan alleges that her poor treatment at the hands of Kordick and Marx commenced shortly after the revelation of her pregnancy. At the motion to dismiss stage, these circumstances are enough to support the inference that the harassing behavior about which Greenan complains was due to her pregnancy.

The third element addresses the extent of the conduct. In determining whether the alleged harassment of an employee is sufficiently severe or pervasive to bring it within Title VII's scope, a court must examine "all the circumstances, [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). Whether an environment is "objectively hostile" requires the Court to determine "whether a reasonable person who is the target of the discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse." Richardson v. New York State Dept. Corr. Serv., 180 F. 3d 426, 436 (2d Cir. 1999). Because the factual record is not yet developed, it is impossible for the Court to undertake a totality-of-the-circumstances inquiry. Therefore, dismissal of the claim on the basis that the harassment Greenan allegedly suffered was not sufficiently severe or pervasive would be inappropriate at this time.

### iv.  Count III – Race Discrimination

Greenan's third count claims race discrimination stemming from her relationship with an African American.[3]  She alleges that the Board's decision not to renew her contract was due, in part, to her becoming engaged to her fiancé and later giving birth to a bi-racial child.  Greenan offers three allegations relevant to a claim of racial discrimination.  First, the Complaint states that she was ordered to remove from her desk family photographs and artwork by her daughter, though other teachers were allowed to keep such items.  Second, she states that she was told not to "bring up" her fiancé at work.  The third allegation is the comment Kordick allegedly made about marks on the ceiling possibly being made by Greenan's fiancé bouncing a basketball.

These allegations, though thin, are sufficient at this stage to proceed to discovery.  The facts surrounding Greenan's race discrimination claim would, in any case, be within the scope of discovery on her other counts.  The strength of the claim will be tested again at summary judgment.

### v.  Count IV – Retaliation

Count IV of the Complaint charges the Board with retaliation under Title VII.  After being informed that Dr. Andes had decided to accept Kordick's recommendation that Greenan's contract not be renewed, Greenan chose to appeal the decision to the Board.  Though the Complaint does not explicitly say so, the Court presumes that the publicly stated grounds of her

---

[3]     The Board insists that such a claim is not even cognizable in this Circuit, and indeed the state of the law is not perfectly clear.  The Fourth Circuit Court of Appeals has recognized in an unpublished, per curiam opinion that "Although . . . this court has no published authority directly on point, it is generally accepted that the spouses of members of protected parties may be able to make out a prima facie case of discriminatory discharge."  Collin v. Rectors and Visitors of University of Virginia, No. 96-1078, 1998 WL 637420 at *2 (4th Cir. Aug. 31, 1998).  The Second, Fifth, Sixth, and Eleventh Circuits have affirmatively recognized claims based on a non-minority's relationship with a minority.  See Holcomb v. Iona College, 521 F. 3d 130, 139 (2d Cir. 2008); Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 156 F. 3d 581, 589 (5th Cir.1998); Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick & GMC Trucks, Inc., 173 F. 3d 988, 994-95 (6th Cir. 1999); Parr v. Woodmen of the World Life Ins. Co., 791 F. 2d 888, 892 (11th Cir. 1986).  Because it seems likely that the Fourth Circuit would also recognize such a cause of action, the Court will not dismiss the claim on this basis.  The Court does not decide the issue at this time, however, and the parties may raise it again at the summary judgment stage.

appeal included allegations of discrimination akin to those she raises here. Greenan alleges that, following her decision to appeal her non-renewal, Kordick held a special staff meeting. At that meeting, Kordick announced that an unnamed person "had made up horrible accusations about her," and that she would have to defend herself before the Board. Staff members were urged to write letters supporting Kordick and told to respond to any questions with "no comment." Pl.'s Compl. 14, Docket No. 1.

Title VII protects an employee who can show that (1) she engaged in protected activity; (2) her employer took adverse employment action against her; and (3) that there was a causal link between her activity and the employment action. Price v. Thompson, 380 F. 3d 209, 212 (4th Cir. 2004). Protected activities fall into two distinct categories: participation and opposition. See 42 U.S.C.A. § 2000e-3(a). [4]

On this Count, the Court finds that Greenan engaged in protected activity, [5] and that Kordick's alleged statement at the meeting, that she would have to defend herself against "horrible accusations" before the Board, would be enough, at this stage, to infer a causal connection between Greenan's actions and any retaliation. Her claim must fail, however,

---

[4]     The distinction between participation and opposition is significant because Title VII offers differing levels of protection depending on the nature of the protected activity. See Laughlin v. Metropolitan Washington Airports Auth., 149 F.3d 253, 259 n. 4 (4th Cir. 1998).

[5]     Greenan urges the Court to find that she engaged in participation activity, meaning that she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." Id. The Complaint, however, states only that "Ms. Greenan appealed to Worcester after receiving notice of her non-renewal, complaining she was non-renewed for discriminatory reasons under Title VII." Pl.'s Compl. 14, Docket No. 1. An appeal to a school board may entail a hearing, but it is not "an investigation, proceeding, or hearing under [Title VII]."

Nonetheless, while Greenan's activity does not count as participation activity, it does count as opposition activity. To qualify as opposition activity, an employee need not engage in the formal process of adjudicating a discrimination claim. See Armstrong v. Index Journal Co., 647 F. 2d 441, 448 (4th Cir. 1981). Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities. See id. An appeal to the Board outside the formal machinery of Title VII, complaining of gender and race discrimination, was an informal grievance procedure by which Greenan could oppose what she saw as discriminatory conduct. It therefore constitutes protected activity.

because she has not identified an adverse employment action taken in retaliation for her decision to appeal her non-renewal.

Count IV of the Complaint will be dismissed.  The faculty meeting and surrounding facts will be open to discovery, because they are relevant to allegations of discriminatory animus on Ms. Kordick's part.  Greenan will be granted leave to restore the count if, following discovery, she can identify a discrete adverse employment action taken against her.

### ii.    Claims against Individual Defendants

#### i.  Count V - § 1983

Count V of Greenan's Complaint alleges violation of the Equal Protection Clause and attempts to hold the Individual Defendants liable under 42 U.S.C § 1983.  The Individual Defendants advance two arguments in favor of dismissal.  First, they urge that Greenan's §1983 claims are precluded by her Title VII claims.  Second, they insist that each of the Individual Defendants is entitled to qualified immunity.[6]

Greenan has asserted a cause of action under Title VII based on pregnancy and race discrimination.  These causes of action are cognizable because Title VII applies to both public and private sector employees.   Greenan also asserts a cause of action under § 1983 based on pregnancy and race discrimination.  Section 1983 creates a cause of action against state officials who violate a plaintiff's constitutional rights while acting under color of state law.

It is clear that under some circumstances, a plaintiff may not bring claims under § 1983 for which another statutory scheme, such as Title VII, provides relief.  See Zombro v. Baltimore

---

[6]    The Court need not consider the Individual Defendants' claim that Count V (misidentified in their Memorandum as Count IV) should be dismissed because "[t]he Plaintiff does not purport to sue the individual defendants in their individual capacity," an argument to which they devote some five pages of their Motion to Dismiss.  Indiv. Defs.'s Mt. to Dismiss 10, Docket No. 16.   This is easily answered by a cursory reading of the Complaint, which states in several places that it names the Individual Defendants "in their official and individual capacities."  See Pl.'s Compl. 2, 15, 16, Docket No. 1.

City Police Dept., 868 F. 2d 1364, 1366 (4th Cir. 1989); Onan v. County of Roanoke, No. 94-1770, 1995 WL 234290 (4th Cir. April 21, 1995).  The Fourth Circuit determined that, in other circumstances, Title VII will not preclude a public sector employee from bringing a § 1983 action based on alleged violations of the Equal Protection Clause.  See Keller v. Prince George's County, 827 F. 2d 952, 957 (4th Cir. 1987).

Greenan's § 1983 claim raises two questions.  First, whether it is coextensive for all purposes (liability and remedy) with her Title VII claim.  Second, whether the law allows her to bring her claims under both statutes.   The answer to these questions is complicated, and the parties' briefs to date do not provide clear guidance.

The scope of discovery will not be affected depending on whether or not Greenan's § 1983 claim is permitted to proceed.  Accordingly, the Court will deny the Motion to Dismiss the claim at this stage, with leave to revisit the issue at summary judgment.  In the summary judgment briefing, counsel should focus on clearly outlining when a plaintiff may and may not bring both a Title VII and a § 1983 claim and on how the Court should decide based on the facts at bar whether such dual pleading is permissible here.

The Individual Defendants' contention that they are entitled to sovereign immunity is much clearer cut.  Sovereign immunity protects government officials sued in their individual capacities "insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would know."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  There is no ambiguity surrounding the constitutional right to be free from discrimination on the basis of gender or race, or the laws preventing an employer from terminating an employee on these grounds.  If Kendrick and Marx did so, as the Complaint alleges, they are not entitled to qualified immunity.

Dr. Andes is a closer case. To establish supervisory liability under § 1983, a plaintiff must show: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. Shaw v. Stroud, 13 F. 3d 791, 799 (4th Cir. 1994).

The sole allegation regarding Dr. Andes is Kordick's statement to Ms. Greenan that Dr. Andes "was aware of, and approved of, her treatment of Ms. Greenan" and that Ms. Greenan should be encouraged to look for employment in other counties. Pl.'s Compl. 9, Docket No. 1. This statement, of course, could be taken in many ways, but without more it is insufficient to maintain Dr. Andes as a Defendant in this case. Dr. Andes will be subject to discovery, however, and Greenan may petition the Court to reassert her claim against him if she can show good cause to believe that she will be able to establish supervisory liability under the test noted above.

### ii. Count VI - Negligent Supervision

Count VI of the Complaint alleges that Dr. Andes was negligent in supervising Kordick and Marx, in that he failed to exercise reasonable care to prevent their misconduct. It is well established that claims for negligent supervision "are derived from the common law [and] may only be predicated on common law causes of action." Hammond v. Taneytown Volunteer Fire Company, Case No. CCB-09-0746, 2009 WL 3347327 (D. Md. Oct. 13, 2009). Because no common law tort of employment discrimination exists in Maryland, this Court has repeatedly

14

disallowed negligent supervision claims appended to Title VII cases. See Davidson-Nadwodny v. Wal-Mart Associates, Inc., Case No. CCB-07-2595, 2010 WL 1328572 (D. Md. March 26, 2010); Hart v. Harbor Court Associates, 46 F. Supp. 2d. 441 (D. Md. 2009); Demby v. Preston Trucking Co., 961 F. Supp. 873 (D. Md. 1997); Maxey v. M.H.M. Inc., 828 F. Supp. 376 (D. Md. 1993). Greenan's negligent supervision claim against Dr. Andes will be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, the Court will, by separate Order of even date, GRANT IN PART and DENY IN PART the Board's Motion to Dismiss (Docket No. 15) as follows:

    i.  Count IV of the Complaint (Retaliation) will be DISMISSED.

The Court will also GRANT IN PART and DENY IN PART the Individual Defendants' Motion to Dismiss (Docket No. 16) as follows:

    i.  Count V of the Complaint (§ 1983) will be DISMISSED as against Dr. Andes; and

    ii.  Count VI of the Complaint (Negligent Supervision) will be DISMISSED.

Dated this 8th day of March, 2011

                        /s/

                  _____
                  Benson Everett Legg
                  United States District Judge